**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CR. NO. 13-142 (RCL)** |
| v. | : | **CR. NO. 13-143 (RCL)** |
| | : | |
| **JOSE EMANUEL GARCIA SOTA,** | : | |
| also known as "Zafado," | : | **Sentencing: November 6, 2017** |
| | : | |
| **JESUS IVAN QUEZADA PINA,** | : | |
| also known as "Loco," | : | |
| | : | |
| Defendants. | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

### I.    Introduction

The United States of America, through its attorneys, the United States Attorney for the District of Columbia and the United States Department of Justice, Criminal Division, respectfully submit this memorandum in aid of sentencing.  The defendants now stand convicted after a jury trial of the murder of Immigration and Customs Enforcement ("ICE") Special Agent Jaime Zapata, the attempted murder of ICE Special Agent Victor Avila, and of using, carrying, brandishing and discharging a firearm during a crime of violence causing death.  All of these offenses took place on February 15, 2011, on Highway No. 57, near the city of San Luis Potosi, Mexico.  For the reasons stated below, and any other reasons that may be detailed at the sentencing hearing, the United States respectfully requests that the Court sentence the defendants to life imprisonment for the murder of Agent Zapata, a consecutive sentence of 20 years for the attempted murder of Agent Avila, and a consecutive sentence of 20 years for the firearm offense.

## II.   Background

### A.  Factual Background of the February 1, 2011 Attack on the ICE Agents[1]

On February 15, 2011, Agent Zapata and Agent Avila were returning to Mexico City after meeting with other U.S. government agents in Matehuala, Mexico. As they drove South on Mexican Highway 57, outside of San Luis Potosi, they encountered two groups of Los Zetas ("Zetas") Cartel *sicarios* ("hitmen"), who attempted to carjack the Agents' vehicle while wielding AK-47s, AR-15s and handguns.  The carjacking turned deadly and, as a result of the defendants' conduct that day, Agent Zapata was killed, bleeding out from his wounds before making it to the hospital. Although Agent Avila survived, his life has never been the same since that day.

At the time of the attack on the ICE Agents, the defendants were members of the Zetas Cartel, and were located in San Luis Potosi, Mexico. In 2011, the Zetas were a sophisticated and violent criminal organization spanning from Central America to the United States-Mexican border. Its hierarchy mirrored the command structure of the military. Each town or city within Zetas control had a commander, which was known as a plaza boss. The plaza boss reported to a regional commander or boss, who in turn reported to the Zetas leadership. The Zetas had a strict hierarchy and exercised control within the organization through threats, torture, and physical punishment. The Cartel routinely engaged in acts of violence to assert and maintain control over its territory through the use of its many *estacas* ("squad" or "hit squad"), which is a group of four armed Zetas *sicarios*, including one commander of the *estaca*, who patrolled the Cartel's territory by motor vehicle. The *estacas* carried out various crimes in furtherance of the Cartel's objectives, including patrolling a portion of Zetas-controlled territory, providing protection for the Cartel's illegal

---

[1] The following facts contained herein are based on the evidence introduced at trial through the government's witnesses, primarily Special Agent Victor Avila, Julian Zapata Espinosa ("Piolin"), Alfredo Gaston Mendoza Hernandez ("Camaron"), and Francisco Carbajal Flores ("Dalmata").

activity from rival cartel members and law enforcement personnel, identifying and eliminating rival cartel members, and engaging in other criminal activity to include, among other things, kidnappings, carjackings, and assassinations.  The *estacas* used weapons to carry out their duties, typically using long guns, AK-47s, AR-15s, or machine guns, and handguns, with each *sicario* typically being given use of one long gun and one hand gun.

In the weeks before the attack on the ICE Agents, Zetas *estacas* were patrolling for and carjacking vehicles in order to acquire these vehicles for the Cartel. Generally, the *estaca* commander, sometimes on orders from a more senior Zetas commander, would decide which vehicles to steal. It was a common, although not exclusive, practice for two or more *estaca* vehicles to be involved in these carjackings.  During the carjackings, one *estaca* forced the victim's vehicle to stop while the other *estaca* pinned the victim's vehicle in from the side or rear to prevent its escape.  The *sicarios* would exit their *estaca* vehicle and brandish their weapons, in order to get the victims to comply with their demands and give up their vehicles.

The defendants were Zetas *sicarios*, and on February 15, 2011, they were each assigned to an *estaca* with other *sicarios*. One *estaca* was commanded by Jose Garcia Sota (also known as "Zafado") and the other commanded by Julian Zapata Espinoza (also known as "Piolin").[2] Each *estaca* contained four *sicarios*, as follows:

| <u>Zafado's Estaca</u> | <u>Piolin's Estaca</u> |
|---|---|
| Jose Garcia Sota ("Zafado") | Julian Zapata Espinoza ("Piolin") |
| Jose Ismael Nava Villagran ("Cacho") | Ivan Quezada Pina ("Loco") |
| Alfredo Mendoza Hernandez ("Camaron") | Ruben Dario Banegas Rivera ("Catracho") |
| "Guacho" | "Raton" |

---

[2] Francisco Carbajal Flores, also known as "Dalmata," was assigned to Piolin's *estaca* but was on vacation on February 15, 2011, and thus not present at the attack on the ICE Agents.

During the attack on the ICE Agents on February 15, 2011, the two *estacas* were armed with both long guns and hand guns. Piolin's *estaca* was armed with two AK-47s and two AR-15s, as well as handguns, and Zafado's *estaca* was armed with four long guns (including at least an AK-47, an AR-15, and an UZI), as well as handguns.

On February 15, 2011, Piolin's and Zafado's *estacas* were engaged in their typical duties of patrolling the area in and around San Luis Potosi, Mexico. That morning, the *estacas* had met up at a car wash in San Luis Potosi, where Piolin had noticed several individuals that he thought were members of a rival cartel. Piolin and Zafado, with the assistance of Loco and one other *sicario*, kidnapped these individuals and took them to a remote area, where members of the *estacas*, including at least Piolin and Zafado, beat the kidnap victims in an effort to obtain more information about them. A decision was made to hand over the kidnap victims to an associate of the Zetas cartel who worked for the Mexican Police, and the victims were ultimately placed on the back of Zafado's vehicle for that purpose.

Later that day, while pulled over on the North-bound side of Mexican Highway 57, members of Piolin's *estaca* noticed the ICE Agents' vehicle. The Agents were driving in a dark blue armored Suburban. Agent Zapata was driving and Agent Avila was in the front passenger seat. Raton noticed that the vehicle appeared to be armored and communicated the same to Piolin. Because armored vehicles were very valuable to the Cartel given their ability to withstand skirmishes with rival cartels and Mexican authorities, Piolin made the decision to pursue and stop the Agents' vehicle. Piolin's *estaca* conducted a U-turn on Highway 57, and then caught up to the Agents' vehicle. After confirming that it was, indeed, a vehicle that he wanted to steal, Piolin called Zafado and requested that Zafado and his *estaca* provide back up, and assist Piolin's *estaca*

4

in stopping the Suburban. The decision to stop and steal the agents' vehicle was made in furtherance of the Zetas' Cartel mission and its carjacking practice.

When both *estacas* caught up to the Agents' Suburban, they stopped it together in a manner similar with their prior practice.  Described by Agent Avila as a "rolling roadblock," Piolin's *estaca* positioned itself in front of the Suburban, slowed down, and swerved left and right in order to force the Suburban off the road while preventing it from escaping. Zafado's *estaca* positioned its vehicle behind the Suburban, trapping the Suburban.  Agent Avila observed members of the *estacas* brandishing their weapons at Agent Zapata and him, in an effort to intimidate them. Eventually, Agent Zapata, who was driving the Suburban and attempting to avoid a collision with the *estaca* vehicles slowing down and closing in on them, was forced to drive the Suburban on to the right-hand shoulder of the Highway, where he was finally boxed in by the two *estaca* vehicles.

Once the Agents' vehicle was stopped, the *sicarios* exited their *estacas* and surrounded the Suburban, and attempted to get the Agents' to give up the vehicle. Piolin and Camaron went to the driver's side door, and attempted to get Agent Zapata out of the driver's seat. While Camaron and Piolin succeeded in opening the driver's side front door, Agent Zapata was able to pull the door back shut and lock the Suburban. The other *sicarios* surrounded the Suburban, with Zafado, Cacho, Catracho and others ending up near the passenger side front door, where Agent Avila was sitting. All the *sicarios* had their weapons drawn and pointed at the Agents, and several *sicarios* were yelling at the Agents in Spanish to get out of the Suburban.  Throughout the attack, Agent Avila tried to explain to the *sicarios* in Spanish that they were diplomats from the U.S. Embassy, and that the *sicarios* were mistaken in stopping them.  Because the agents failed to comply with the commands to exit the Suburban, Piolin fired his handgun into the air near the front driver side of the Suburban.  During this commotion the Suburban's passenger side front-door window was

lowered two-to-three inches, and two of the *sicarios* – Zafado and Cacho[3] -- inserted their weapons (a long gun and a handgun) into the window.  The situation grew tense, and shortly thereafter one of the *sicarios* at the passenger side front-door window fired into the vehicle, which began a volley of fire by all *sicarios*.

The *sicarios* fired nearly a hundred rounds during the attack, with several rounds entering the Suburban through the open passenger side front window.  Several of these rounds struck the Agents, including one which hit Agent Zapata in the femoral artery.  Agent Avila was also hit in his left leg, but was able to assist Agent Zapata in driving the Suburban away from the firing *sicarios*.  The Suburban crossed the two South-bound lanes of traffic and crashed into the median, where it became disabled.  As the Suburban attempted to drive away, all the *sicarios* continued to fire at it.  The sicarios then loaded themselves into their *estacas* and drove away, but not before *sicarios* from both *estacas* fired additional rounds at the disabled vehicle.  Both *estacas* drove a short distance, performed a U-turn, and proceeded North to San Luis Potosi, where they eventually exchanged their vehicles and made their good escape.

After the *estacas* left the scene, Agent Avila continued with his efforts to ask for emergency assistance, and he was able to reach by telephone the U.S. Embassy in Mexico City and explain his general location.  Members of the Mexican Federal Police ultimately arrived at the scene of the attack, and had to talk Agent Avila out of the Suburban so that he and Agent Zapata could be transported by helicopter to the hospital.  Although the Commander of the Federal Police in San

---

[3] This was the credible testimony presented at trial by Mendoza Hernandez, aka "Camaron."  The government recognizes, however, that other co-conspirators have identified different persons as being the likely "executioners" by the window.  For example, one co-conspirator initially stated that Piolin and Zafado were the two *sicarios* who inserted their weapons inside the vehicle and fired the shots that killed Agent Zapata and wounded Agent Avila.  This person later recanted his statement that Piolin was the shooter by the window, but maintained that Zafado was one of the executioners.  Similarly, Zapata Espinoza aka "Piolin" initially told the government that Catracho was the shooter by the window.  Piolin later explained that his previous statement was based on a statement he heard Catracho make at a later point.  Another co-conspirator told the government that Loco and Raton were the shooters by the window.  In short, throughout the investigation, various persons have been "identified" as the executioners by the window.

Luis Potosi felt a pulse when he arrived on scene and examined Agent Zapata, Agent Zapata expired before he arrived at the hospital.  After the agents were taken away from the scene, the Mexican authorities did their best to secure and catalogue the scene. Later that same night, American personnel from the U.S. Embassy in Mexico City arrived in San Luis Potosi to provide assistance and receive information about the attack.

Law enforcement from Mexico and the United States worked together to identify the perpetrators. Piolin's *estaca*, which included Piolin, Loco, Catracho, and a fourth individual, Francisco Carbajal Flores ("Dalmata"), was arrested in the early morning hours of February 23, 2011. At the time of the arrest, Mexican authorities recovered five long guns (three AK-47s and two AR-15s) from the location of the *estaca*'s arrest. Test-fired cartridges from three of the confiscated weapons (two of the AK-47s and one of the AR-15s) matched cartridges found at the scene of the attack on the ICE Agents.  Members of Zafado's *estaca*, including Zafado and Cacho, were arrested several weeks later.  Although Camaron was not with Zafado at the time of the arrest, he was identified and, in 2012, found to be held at a Mexican prison in Veracruz, Mexico.  All of these individuals either waived extradition or were extradited to the United States. Neither Raton nor Guacho were ever fully identified, located, or brought to justice for their participation in the attack, and based on information developed during the investigation they are believed to be dead.

**B.  Specific Factual Information About the Attack Participants**

**1.  Defendant Jose Garcia Sota ("Zafado")**

As previously discussed, Zafado was the commander of one of the *estacas* that conducted the attack on the ICE Agents.  As a commander, Zafado had three *sicarios* assigned to him and under his control: Cacho, Camaron and Guacho.  On the morning of February 15, 2011, Zafado met Piolin at a car wash in San Luis Potosi, and helped Piolin kidnap a number of persons that

were suspected of being rival cartel members.  Zafado later helped to interrogate the kidnap victims, and put them in his *estaca* vehicle in order to deliver them to a Zetas associate that worked for the Mexican police.

When Piolin requested assistance to conduct a carjacking of the agents' vehicle, Zafado also agreed to help.  During the attack, Zafado wielded an AK-47. Zafado was one of the *sicarios* seen by Camaron at the front passenger side window of the Suburban with his firearm inserted into the opening of the window, moments prior to when the firing started.

After the attack, Zafado continued to command his *estaca* and took steps to conceal his participation in the attack. Zafado arranged to obtain a new *estaca* vehicle from the Cartel on the afternoon of the attack. Zafado's *estaca* was later involved in a shoot-out with what was thought to be rival cartel members, during which the *estaca* abandoned the weapons they used in the attack on the ICE Agents.

Zafado made several statements about his involvement in the attack. In the days following the attack, the Zetas *sicarios* in San Luis Potosi retreated to the Hotel Montezuma outside of the city. While there, Zafado bragged to other *sicarios* that he had participated in the attack, and explained that his gun had been stuck in the Suburban's window. He used a long gun to simulate how, during the attack, he had put his AK-47 through the Suburban's open passenger side front window.  Months later, when he was in prison in Mexico, Zafado told Dalmata, "I fucked those guys up."  Zafado continued to brag about the attack even years later. While at the D.C. Jail in 2016, Zafado told another inmate, Jose Argueta, about the attack, and noted that the "idiot official dumbass copilot opened the window," referring to Agent Avila.  Zafado also told Argueta that Zafado had "made the weapons disappear."

### 2. Defendant Ivan Jesus Quezada Pina ("Loco")

Loco was a *sicario* in Piolin's *estaca* during the attack on the ICE Agents. Earlier that morning, Loco had assisted Piolin and Zafado in kidnapping suspected rival cartel members from a car wash in San Luis Potosi.  Prior to the attack on the agents, Loco was seated in the rear of the *estaca* vehicle with Catracho.  During the attack, Loco exited Piolin's *estaca* vehicle and was one of the *sicarios* who surrounded the agents' Suburban.  Loco brandished a long gun, which may have been an AR-15, a weapon he had been using earlier that day and which he used in the days after the attack.

Afterwards, Loco made statements that implicated himself in the attack on the ICE Agents. While at Hotel Montezuma, Loco told Dalmata that he had participated in the attack and stated, "We fucked it up." Loco also demonstrated to Dalmata how he had shot at the Agents' vehicle by hoisting himself out of the *estaca* vehicle's rear driver side window, and shooting across the top of the vehicle toward the Agents' Suburban.

## C. Procedural History

On May 16, 2013, Zafado and Loco were charged in this case in a four-count Indictment with: (1) the murder of an officer or employee of the United States, in violation of 18 U.S.C. §§ 1111, 1114; (2) the attempted murder of an officer or employee of the United States, in violation of 18 U.S.C. §§ 1113, 1114; (3) the attempted murder of an internationally protected person, in violation of 18 U.S.C. §§ 1113, 1116; and (4) using, carrying, brandishing and discharging a firearm during and in relation to a crime of violence causing death, in violation of 18 U.S.C. §§ 924(c), (j)(1). On July 10, 2017, trial against the defendants began before Judge Royce C. Lamberth in the U.S. District Court for the District of Columbia. On July 27, 2017, the jury returned a guilty verdict against both defendants on all of four charges.

### III.    Legal Framework

####    A. Statutory Penalties

The crime of First Degree Murder of an Officer of the United States (Count 1), 18 U.S.C. § 1111, is punishable by a sentence of death or mandatory imprisonment for life, a fine of not more than $250,000, or both, and not more than five (5) years of supervised release. *See* 18 U.S.C. §§ 1111(b), 3571(b)(3), 3583(b)(1). Additionally, the defendant must pay mandatory restitution under 18 U.S.C. § 3663A.  In order to secure the extradition of the defendants from the Mexican government, the United States agreed not to seek a sentence of death, and accordingly, in this case the statute requires a sentence of life imprisonment.

The crimes of Attempted Murder of an Officer or Employee (Count 2) and Attempted Murder of an Internationally Protected Person (Count 3), 18 U.S.C. §§ 1113, 1114, 1116, are punishable by a maximum sentence of twenty (20) years' imprisonment, a fine of not more than $250,000, or both, and not more than five (5) years of supervised release. *See* 18 U.S.C. § 1113, 3571(b)(3), 3583(b)(1); *see also* § 1114(3) (defining attempted murder of an officer of the United States and referencing the penalties in § 1113); § 1116(a) (defining murder of an internationally protected persons and referencing the penalties in § 1113). Additionally, the defendant must pay mandatory restitution under 18 U.S.C. § 3663A.

The Firearms Count (Count 4), 18 U.S.C. §§ 924(c), (j)(1), is punishable by death or by imprisonment for any term of years up to life, but carries a minimum sentence of ten (10) years given the facts found by the jury in this case. *See* 18 U.S.C. § 924(c)(1)(A)(iii) (imposing a mandatory minimum sentence of "not less than 10 years" if the firearm is "discharged"); § 924(c)(1)(B)(i) (imposing a mandatory minimum sentence of "not less than 10 years" if the firearm is a "semiautomatic assault weapon"); § 924(j)(1)) ("[A]ny person who, in the course of a

violation of subsection (c) causes the death of a person through the use of a firearm, shall (1) if the killing is a murder (as defined in section 1111) be punished by death or by imprisonment for any term of years or for life . . . ."). The sentence on this count must run consecutive to all other counts. *See* 18 U.S.C. § 924(c); U.S.S.G. § 5G1.2(a) & Cmt. n.2(A).

### B. Legal Framework and Applicable Precedent

In determining the appropriate sentence, the Court engages in a two-step process. As one member of this court has held, "[*United States v.*] *Booker*, [543 U.S. 220 (2005),] requires judges to engage in a two-step analysis to determine a reasonable sentence." *United States v. Doe*, 412 F. Supp. 2d 87, 90 (D.D.C. 2006) (Bates, J.).

> [A] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing sentence.

*United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).

The United States Sentencing Guidelines (the "Guidelines") are the initial starting point for the Court in sentencing. While in *Booker*, 543 U.S. 220, the Supreme Court held that the United States Sentencing Guidelines are no longer mandatory, "[a]s a matter of administration and to secure nationwide consistency, the Sentencing Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). While, to be sure, "[i]n accord with 18 U.S.C. § 3553(a), the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence," *Kimbrough v. United States*, 552 U.S. 85, 90 (2007), it remains the case that "the Commission fills an important institutional role: It has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise.'" *Id.* at 108-06 (*quoting United States v. Pruitt*, 502 F.3d 1154, 1171 (10th

11

Cir. 2007) (McConnell, J., concurring)).  The Supreme Court "accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'"  *Id.* at 89 (*quoting Rita v. United States*, 551 U.S. 338, 350 (2007)).

After that calculation, a sentencing judge must "tailor the sentencing in light of other statutory factors as well." *Booker*, 543 U.S. at 245. When weighing the § 3553(a) factors as part of its determination of an appropriate sentence, the Court should consider not only the nature and circumstances of the offense and the history and characteristics of the defendant, but also the applicable sentencing objectives—that is, that the sentence: (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment; (4) afford adequate deterrence; (5) protect the public; and (6) effectively provide the defendant with needed educational or vocational training and medical care.  *See* 18 U.S.C. § 3553(a)(1), (2).  In addition, the sentence should reflect "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).

The entire sentence imposed should be based on these factors, as a "sentencing package." *See United States v. Townsend*, 178 F.3d 558, 567 (D.C. Cir. 1999) ("sentences on multiple counts may comprise a 'sentencing package'"); *see also Greenlaw v. United States*, 554 U.S. 237, 253 (2008) (recognizing the practice of "sentencing packag[ing]" in cases with multiple counts of conviction).  If the sentence imposed on the count carrying the highest statutory maximum is adequate to achieve the total punishment, then the sentences on all counts shall run concurrently, except to the extent otherwise required by law." U.S.S.G. § 5G1.2(c).

Here, the First Degree Murder count carries with it a mandatory sentence of life imprisonment, and the Court need not apply the § 3553(a) analysis to that count, as the Court has

no discretion but to imply the life sentence mandated by the statute. *See, e.g.*, *United States v. Carson*, 455 F.3d 336, 384-85 (D.C. Cir. 2006) (no remand necessary under *Booker* where mandatory life sentences were imposed).  As numerous other circuit courts have held, *Booker* is not implicated where a defendant is subject to a mandatory life sentence.[4]  Accordingly, this Court need only consider the appropriate Guidelines range for the remaining counts (counts 2-4) and then apply the § 3553(a) factors to determine an appropriate total sentencing package for each defendant. However, as previously explained, regardless of the sentence on Counts 1-3, the sentence on the Firearms Count (Count 4) must run consecutive to all other counts. *See* 18 U.S.C. § 924(c); U.S.S.G. § 5G1.2(a) & Cmt. n.2(A).

## IV.    Applicable Guideline Range

The government concurs with the analysis of the Presentence Investigation ("PSI") report writer, Kathie J. McGill, who has concluded that pursuant to the United States Sentencing Guidelines (hereinafter "USSG"), Zafado has a total offense level of 43, a criminal history category of I, and faces a Guideline range of life in prison with respect to Counts 1-3 and a Guideline range of 10 years' imprisonment with respect to Count 4 (which must run consecutive to all other counts). *See* PSI at p. 12, ¶ 46 (Guideline range for Count 4 is the minimum term of imprisonment required by statute, under USSG § 2K.2.4(b)); p. 14, ¶ 75 (Total Offense Level for Counts 1-3).

The government also concurs with the analysis of the PSI report writer, Kathie J. McGill, who has concluded that pursuant to the USSG, Loco has a total offense level of 43, a criminal history category of I, and faces a Guideline range of life in prison with respect to Counts 1-3 and

---

[4] *See United States v. Duncan*, 413 F.3d 680, 683 (7th Cir. 2005*); United States v. Bermudez*, 407 F.3d 536, 545 (1st Cir. 2005); *United States v. Cardenas*, 405 F.3d 1046, 1048 (9th Cir. 2005); *United States v. Childs*, 403 F.3d 970, 972 (8th Cir. 2005); *United States v. Moore*, 401 F.3d 1220, 1222 n. 1 (10th Cir. 2005); *United States v. Groce*, 398 F.3d 679, 682 n. 2 (4th Cir. 2005); *United States v. Shelton*, 400 F.3d 1325, 1333 n. 10 (11th Cir. 2005); *United States v. Sharpley*, 399 F.3d 123, 127 (2d Cir. 2005).

a Guideline range of 10 years' imprisonment with respect to Count 4 (which must run consecutive to all other counts). *See* PSI at p. 12, ¶ 46 (Guideline range for Count 4 is the minimum term of imprisonment required by statute, under USSG § 2K.2.4(b)); p. 14, ¶ 75 (Total Offense Level for Counts 1-3).

## V.   Analysis

### A.  Sentencing Recommendation

Given the facts and circumstances of the case, the history of the defendants, as well as the other 18 U.S.C. § 3553(a) factors, the government respectfully requests that the Court sentence defendants to a term of life imprisonment on Count 1, a term of 20 years on Counts 2 and 3 (to run consecutive to Count 1 and concurrent each other), and a term of 20 years on Count 4 (to run consecutive to all other counts).

### B.  18 U.S.C. § 3553(a) Factors

#### 1.  The Nature and Circumstances of the Offenses & Impact on the Victims

This was a crime of opportunity. The defendants hunted down the agents for their vehicle. Seeing the Suburban pass by, they changed their plans, stalked it, surrounded it, and forced it off the road. Defendants wanted the vehicle and took it without any regard to the consequences for themselves or the victims, as was typical of their callous lifestyle in the Cartel. The Suburban was valuable to the Cartel because it would resist attacks from rival cartels and the Mexican authorities. Their brazen attack shows how they believed they owned and controlled San Luis Potosi. They acted as if they had a right to anything passing through their "territory."

The defendants' crime ended the life of Agent Zapata and changed forever the life of Agent Avila. Agent Zapata had arrived in Mexico only days prior, on a temporary duty assignment for which he had volunteered. Agent Zapata was at the beginning of his law enforcement career,

following in the footsteps of his father and brothers in his service to the United States. His life was cut short before he had the chance to truly show what he could achieve, or to have a family of his own.  Agent Zapata's death took and continues to take a serious toll on his family.  His parents and brothers continue to mourn his loss, and sitting through the defendants' three-week trial served to reopen their emotional wounds.

Agent Avila's life has not been, and may never be the same. Although Agent Avila survived the attack, he carries the memory and the scars of February 15, 2011, with him forever. He had difficulty recovering from the physical, mental and emotional toll of the attack, and it ultimately resulted in him leaving a career at the Department of Homeland Security.  The attack also had a serious impact on Agent Avila's family, who had to live through the trauma of the attack while located in Mexico City, including Mrs. Avila who listened to her husband's cries for help when he called into the U.S. Embassy during the attack.

### 2.  The History and Characteristics of the Offenders

Both defendants had committed themselves to a criminal life in furtherance of a powerful drug cartel. Both defendants served as Cartel *sicarios*, or hitmen. They were responsible for patrolling a portion of Zetas-controlled territory, providing protection for the Cartel's illegal activity from rival cartel members and law enforcement personnel, identifying and eliminating rival cartel members, and engaging in other criminal activity to include, among other things, kidnappings, carjackings, and assassinations.  Further, *sicarios* were responsible for combating and eliminating the Mexican authorities.

Both defendants were committed to the Cartel. Garcia Sota had been in the Cartel for over a year, and was so entrenched and accomplished that he was promoted to an *estaca* commander. Loco had been in prison in Nuevo Laredo, Mexico, and was broken out by members of the Cartel.

Loco was a favorite of the Zetas regional commander, who arranged to have him transferred to San Luis Potosi.

The defendants' commitment to their criminal lifestyle was shown in their actions in the days following the attack. Zafado got his *estaca* a new vehicle after the attack, and subsequently was in a shootout with what he thought were members of a rival cartel.  Loco, together with his *estaca*, participated in a kidnapping of a woman and her son, in order to hold them for ransom. While guarding the woman, Loco was seen by Dalmata molesting the woman. It is clear that the attack on the ICE Agents barely caused the defendants to pause their criminal lifestyle.

Neither defendant showed remorse after attack. When he gathered with other Zetas at the Hotel Montezuma a few days later, Zafado bragged about his role in the attack and was bold enough to demonstrate how he shot at the agents using his long arm. Zafado continued to brag about the attack in the months and even years after it took place, calling Agent Avila an "idiot" and a "dumbass." Nor has Loco shown remorse for the attack. He, too, admitted to his role in the attack with at Hotel Montezuma, and demonstrated how he committed the crime.

### 3. The Need to Promote Respect for the Law, to Provide Just Punishment, to Afford Adequate Deterrence, and to Protect the Public.

Imposing substantial prison terms in this case is absolutely necessary to promote respect for the law, provide just punishment, and afford adequate deterrence.  Standing alone, the violence the defendants wrought was reprehensible and warrants significant prison terms.  Additionally, by imposing substantial prison sentences, the Court will also send the appropriate message regarding the protection of U.S. officials stationed abroad, and the United States' ability and willingness to bring to justice those who would do them harm.  A substantial prison sentence is also imperative to protect the public from these defendants and their violent activities.  The evidence at trial demonstrated that the defendants carried out kidnappings, carjackings, and a deadly shooting in a

public space, all in one day.  Lengthy incarceration is required to ensure the safety of those who live in the defendants' community.

### 4.  The Need to Provide the Defendant with Educational or Vocational Training.

Although the defendants could likely benefit from educational and vocational training, the other factors bearing on the seriousness of the offenses and the need for strong deterrence outweigh this element in fashioning a just sentence.

### 5.  The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct.

All the participants in the attack who have been brought to justice are facing life sentences for their conduct. The government is requesting downward departures for the cooperating defendants, due to their acceptance of responsibility and willingness to provide the government with information and testimony, which furthered the evidence in this case and secured a conviction.  There is no sentencing disparity given the differing situations of these defendants, who went to trial, and the cooperating defendants, who have accepted responsibility.

### C.  Restitution

Because the defendants were found guilty of Counts 1-3, all crimes of violence under 18 U.S.C. Ch. 1, Sec. 16, they are required to pay restitution under 18 U.S.C. § 3663A.  The government has requested from the victims' families information and documentation related to any potential restitution order in these cases, and will forward to the Court and defense counsel any such information or documentation when received.  As of the date of this filing, the government has been informed that Agent Avila will request $198,000 in restitution and that he will submit the necessary documentation to support a restitution order for that amount under 18 U.S.C. § 3663A.  Similarly, the government has been informed that the family of Agent Zapata will request $2,000 in restitution to cover funeral related expenses under 18 U.S.C. § 3663A.  The

government respectfully requests that the Court order that the defendants pay restitution for the documented appropriate amount.

## VI.     Conclusion

Given this background, the defendants should be incarcerated for the longest periods of time permissible, beginning first with a sentence of life without imprisonment for Count 1, followed by a sentence of 20 years' imprisonment on Count 2 and Count 3 (to run consecutive to Count 1 and concurrent to each other), and a sentence of 20 years' imprisonment on Count 4 (to run consecutive to all other counts).

Respectfully Submitted,


JESSIE K. LIU                                         DAVID L. JAFFE
United States Attorney for the                        Acting Chief
District of Columbia                                  DAVID KARPEL
                                                      Trial Attorney
/s/ Fernando Campoamor-Sánchez                        Organized Crime and Gang Section
MICHAEL C. DILORENZO                                  Criminal Division
FERNANDO CAMPOAMOR-SANCHEZ
Assistant United States Attorneys                     ARTHUR WYATT
                                                      Chief
                                                      KAREN P. SEIFERT
                                                      Trial Attorney
                                                      Narcotic and Dangerous Drug Section
                                                      Criminal Division


Date: October 31, 2017

## **Certificate of Service**

I certify that, by virtue of the Court's ECF system, a copy of the foregoing Government's Sentencing Memorandum has been sent to Counsel for defendants Jose Garcia Sota and Jesus Ivan Quezada Pina, (counsel Robert Feitel, Sandi Rhee, and Elita Amato), on October 31, 2017.

/s/ Fernando Campoamor-Sánchez
Fernando Campoamor-Sánchez
Assistant United States Attorney